May it please the Court, good morning. I'm Donald Horgan here on behalf of Petitioner Ewell, and I would like to reserve two minutes for rebuttal, if I may. This appeal raises two central issues, the State Appellate Court's denial of Ewell's claims under Title III and the State Court's denial of his claim about jury exposure to prejudicial evidence that was never admitted during the trial. I want to focus on the Title III claim, and particularly the statutory element of that claim, which involves the failure to seal the recordings of the digital pager transmissions from Ewell to his co-defendant, Joel Radovich, and on why Ewell is entitled to relief under both 2254d1 and 2. As you know, clearly established Supreme Court precedent, United States v. Ojeda-Rios, requires law enforcement to seal intercepted electronic communications, if possible, or to provide a satisfactory explanation for why they didn't do it. Otherwise, the evidence must be excluded under Title III, Section 2518a. And in this case, the government never demonstrated that it sealed the key transmissions between Ewell, from Ewell to Radovich. They never gave any satisfactory explanation for why they didn't. What had happened was that at the trial level, the trial court had suppressed a variety of pieces of evidence under Title III. The State appealed that, made an interlocutory appeal of that ruling to the State Court of Appeal. Most of the Title III violations, rulings on the Title III violations in Ewell's favor were reversed on standing grounds. But there was another issue that had never been placed before the trial court, and that the State Court of Appeal took up on its own. And that was the question of sealing, and whether the State had ever complied with its obligation either to seal or to provide a satisfactory explanation why they did not seal. And though, again, though that question hadn't been raised in the trial court below, the appellate court excused the failure by making a factual finding that the digital pagers could not have been recorded in the first instance. And because that was so, said the Court of Appeal, there could never have been any sealing conducted. But the issue of suppression under that section of the Title III was raised, though, in the suppression hearing. I mean, your predecessor, were you counsel below? I don't know whether you were or someone else was. But the argument was made that that section applied. And an argument was also made that the officer tried to make a handwritten log of the calls, which would that not suggest to the Court of Appeals that there wasn't a possibility, or at least the officer didn't think there was a possibility of making a recording if what you or your predecessor argued was that he tried to make a handwritten log, and you argued that that log under Suarez, you disagreed with Suarez and said that should have been something that required sealing and what, you know, and the suppression remedy. Your Honor, I actually think that was a different argument that was placed in issue in front of the trial court. That related to the overheard statements of Joel Radovich, oral transmissions under Title III, which is not what was – which is something separate and distinct from the pager communications from Ewell to the digital pager, wherein – to Radovich's digital pager, wherein Ewell supplies Radovich with a pay phone for Radovich to call him back. That was not the same sealing issue that was placed in front of the trial court. The trial court was considered and ruled upon whether or not law enforcement had an obligation to – when they wrote down what they heard Radovich saying, whether that was a – whether that transcription was itself a recording under Title III. And the ruling was that no, that that did not constitute a recording in the first instance. Title III did not apply to those. But that's a separate and distinct factual issue from the sealing of the digital transmissions from Ewell to Radovich. Those are numbers that are entered into the pager and then received at the other end by Radovich. That's a separate argument. And the trial court did not weigh in on that. And nor did the government ever make the argument or ever demonstrate at the trial level that it was – that the digital pager could not record these transmissions or that – My point wasn't that so much as that there was an indication in a record from which the appellate court could have relied that there was an effort by the law enforcement officer to – and I believe you're right, it was Radovich. Radovich, yes. Radovich-Foyer said, And I believe the return on these pager clones actually commences on this date, and interceptions continued until November. And then in December, the return was made, and there were almost two full pages of interceptions. So there was, it appears to be, an attempt to maintain a log of numbers intercepted. I mean, that suggests to me that there may have been a basis for the court of appeal to believe that the officers at least didn't think it was possible to record the numbers that had been intercepted on the pager. Well, I guess I can only say, Your Honor, even when the court of appeal ruled on the issue, it never cited any such, you know, anything in the trial record to that effect. I think it was, it simply said, the court of, the State court of appeal, look, the record is as developed, you know, the record that we have in front of us doesn't show affirmatively that there was, that it was possible to record or that it was possible to record in the first instance. But it never cited or relied upon any testimony from the officers at the hearing to that effect. And again, I think if the court looks closely at it. Is there a transcript of that oral argument? I don't believe that that's in the excerpts of record, Your Honor, but. I'm just, we came, as I was preparing, came across this point as to whether there was any support for the court of appeal finding on that question. One of the questions that came up was whether that question might have arisen at oral argument and whether there might have been an oral representation by counsel at the time that the court of appeal was relying on. Yeah, I just don't, I'm relying on the written ruling of the court of appeal, Your Honor, and I frankly don't, I have never seen anything at the trial level record, and I'm not, I can't cite the court to it right now, that indicates that they ever focused on that precise question. I think it is a different question under Title III than the one that was actively considered, both by the trial court and that was raised on appeal. But they had never put, the State had never put into issue the whole question of whether Title III afforded a suppression remedy for the intercepts of the Yule pagers. That was a subset or a conceptually different kind of intercept than the ones that I think they were litigating at the trial level. Counsel, even if we thought that there was some mistake here, I don't see that Title III is sort of strict liability on the State. There is an exclusion remedy there, but at this point, it looks like you've got to show some kind of a miscarriage of justice in order to prevail. So what's the miscarriage of justice? Well, I think, frankly, Your Honor, under Hall, United States v. Hall and Lambert, there are two ways that this kind of claim can get, is cognizable on Federal habeas. One is that there's a miscarriage of justice, which is probably some kind of, you know, harmless error, let's look at the entire rest of the record kind of test. But there is an alternative test under Hall, and it's also identified in Lord v. Lambert, which is, does the violation you're complaining of reflect an omission that's inconsistent with the rudimentary demands of fair procedure, and are there exceptional circumstances where the need for the remedy afforded by habeas is apparent? And we submit that that test is satisfied here. How? Because the omission that's inconsistent with the rudimentary demands of fair procedure is the refusal of the State courts to give, to afford you an evidentiary hearing on this issue. They never, in the first place, the How did this play out in the trial? How it played out in the trial was that the, as a result of the ruling by the State Court of Appeal, evidence got admitted, key evidence got admitted against Yule. There were four conversations. One was an instance on May 12, 1993, where the police went into Yule's dorm room and said, we think we know who killed your family, and we think it's Joel Radovich. As a result of the intercept and the violation of Title III, the government was able to put into evidence that they surveilled Yule and observed him next making a call to Radovich, and they also were able to introduce the substance of that conversation. So it's not the fact of the pager numbers that they're receiving. It's the evidence that followed. It's what's derived from it. What was derived from it in this instance was surveillance of Yule. You know, he puts in the number where, of a pay telephone, which allows law enforcement to then go to that telephone and observe Yule at that telephone. So it's the surveillance of Yule, and it's the linking Yule to Radovich at that time in connection with that conversation. I asked about miscarriages because unlike Miranda, this doesn't appear to have sort of a truth, a truth function to it. That is, it doesn't appear that Congress was concerned here that evidence that would be obtained electronically would be unreliable and that you might have, that it might be unfair in that respect. It wanted the police to play by certain kinds of rules with respect to electronic interception, but it doesn't seem that Congress had concern that the police would come up with something that was untrue or unfair to the client. So I'm still sort of back on the miscarriage here. What's the problem? I understand that you'd rather that the evidence hadn't come in. But I haven't heard any argument that the evidence was unfair or that it was untruthful or that he was mischaracterized or that the police abused the evidence that they obtained. So what's the problem? Well, the problem is, again, I just have to adhere to the test, the Lord test, that there are two different ways you look at it. One is if you've got, if you haven't been afforded a fair hearing on an issue, that that's enough to, or if there's really a fundamental omission, and that's what we have here, not consistent with fair procedure. But could you not have filed a habeas petition in State court or filed a motion to supplement the record in the court of appeals and you didn't? I know that that's what the district court below cited as sort of central to its analysis. Oh, you know, you could have, you didn't present, you had an affidavit, and they did have Mr. Yule did submit an affidavit from an FBI agent indicating that, in fact, the FBI may have, may well have had a capacity to record these digital communications. But this wasn't the FBI, was it, though? I'm sorry. I thought it was Fresno police. Was it Fresno police or FBI? This was, this was Fresno police, yes. Okay. It was. And your affidavit dealt with FBI. Well, yeah. And so the point is that what happened was on the second appeal in the State court, Mr. Yule submitted an affidavit, you know, showing that, at least in the northern district, the FBI was aware that these kinds of digital recorders did have a capacity to record and then could be sealed. So it was a way of illustrating the point that, you know, this was a live issue. Mr. Yule submitted that and requested judicial notice. And what the State court of appeal didn't say, well, that's an improper presentation of the evidence, and we're denying your claim. We're going to stick to the law of the case because you didn't present it properly. That's not what the State court of appeal said. The State court of appeal said, no, we won't consider it because you've already cited us a case from Texas which shows that in 1989 there were digital recorders, that digital recorders had a capacity to record. And we don't regard it as terribly important. So that's why we're not taking judicial notice of your affidavit. The point being. And then they said even if they did, it wouldn't change the result. That's true. That's correct. But my point is when the district court said, well, you, you know, the reason that you this was fairly decided against you is because you did not properly present your claim in the State court, that's not true. The State court never said any such thing. They were entitled to take judicial notice of the affidavit. And their reason for rejecting consideration of it was no, it was not because Mr. Yule hadn't proceeded by habeas. It wasn't because he hadn't moved to augment the record. It was because they didn't think that it would have changed their resolution of the issue. Wasn't there other evidence linking your client, Yule, to Radovich? Absolutely, Your Honor. There's no question. But what was so key and why the investigation went on for months after this, regardless of all the other evidence showing a link between the two, was that the police needed to link Radovich to Yule in connection with discussions about this event, about the death of Yule's family, and the four conversations, May 12th, 1993, May 14th, 1993, May 19th, 1993, and June 3rd, 1993, are all key. I mean, some of the things that are said in those conversations, and the Court, if they want to review what was said in those conversations, it's at ER 792 and the page is following. But those are what is, if the jury can conclude from those conversations that it is Radovich talking to Dana Yule, it made the government's case exponentially stronger against him. Did you want to save a minute for rebuttal? Yes, I would, Your Honor. Yes, please.   Good morning. May it please the Court. Leigh Ann Lamont on behalf of Appellees. I'm going to start by stating that in the record, I think there was a certain misrepresentation as far as what the actual suppression hearing entailed. It entailed that there were written motions by both defendants' counsels regarding the digital pager, and specifically in the excerpts on 698 of the excerpts, Mr. Jones, who is one of Mr. Yule's attorneys at trial, specifically raises the issue of 2518-8. And he specifically states that he recognizes the case of U.S. v. Suarez, and he specifically states that, I can read from it verbatim, it's in the second paragraph on 698, that he recognizes the case of U.S. v. Suarez argued that since mechanical recordings of an intercepted page, numeric page, was not possible, that the manual recording was not tantamount to a recording under that code section, and since at that time there was no other alternative, this may not apply to the cloned pagers. Our argument is, however, that a manual recording is the alternative, only alternative available. So they specifically addressed that at the oral argument, which was on October 10, 1996. The oral argument before the trial court? Before the trial court, correct. When they made their motion. Correct. When they made their motion. That is correct. So they were relying at that time on the fact that the Fresno police had failed to make a manual recording. They, no, I think they were, they had made a manual recording. I apologize. I was not trying to cut you off. Anyway, that they had made a manual recording, and that that was the only alternative was the manual recording. And they actually, and when I'm saying they, Yule's attorneys, he had three attorneys at the time. Mr. Jones is the one who was making this argument. They had five volumes of exhibits that went with their suppression motions and their motions to quash the warrants. And within those records, there is a copy, basically what the police did, what the Fresno Sheriff's Department did, although I will submit they did not comply with Title III. They did go back and get it sealed, get the search warrant that they did obtain sealed, approximately one month after they quit using the clone pager. And they attached to it two pieces of paper that showed the manual. And when I say manual, it was typed up, but it was clearly not something that was from a recording device. It was something that Officer Sosa, one of the officers with the Fresno Sheriff's Department, had recorded manually, and that was sealed. And it was two pages of phone numbers, the dates and the times of the pages. And that was attached to their exhibits that they actually filed with the trial court. So to say that they didn't have an evidentiary hearing or they didn't have a full and fair opportunity to litigate this is completely unfair based on the record. Based on the record, the 50 CA certainly was reasonable in determining that manual recordation was the only way that they could record at that time, because both what was sealed, which was a manual recordation, as well as the oral arguments show, there really was no dispute over that issue, that it was a manual recording. So it was not an unreasonable determination of the facts by the state court when they decided that it was the only possible way at that time for the Fresno Sheriff's Department to be manual recording, to be recording it manually. And they based that on the evidence, which was the five volumes that were attached, as well as the oral arguments, as well as the moving papers. So they certainly had a reasonable basis to come to that conclusion, and it was not an unreasonable determination of the facts. In addition, under Title III, as the Court has already pointed out, suppression on habeas is not the remedy unless there was a miscarriage of justice. And in this case, there certainly was not a miscarriage of justice. There was overwhelming facts that showed that the information that they obtained from the pager was very accurate and that it also did show his guilt. It wasn't that the information that was in the pages was inaccurate in any way. In fact, by following up on the pages, as the appellant has stated, they did actually surveil both the co-defendant and Mr. Yule, and they were able to do this because they found out where they were paging people to and from. And there was accuracy of those phone numbers, or they never would have been able to go to those locations. So it's not a situation where you have a wiretap where there's a recording and there's a danger that that recording has been altered in some way or is not reliable. In this case, what they obtained was reliable. There were procedural defects, but what they obtained was reliable. And there was no miscarriage of justice because Mr. Yule was found guilty based on reliable information. And he wasn't found guilty only on the information that was obtained through the cloned pager. There was a wealth of information beyond that that was presented to the jury. And even if this Court did a Brecht analysis, there certainly was an enormous amount of evidence against him. The co-defendant and Mr. Yule had known each other since college. Immediately, not immediately, several months after the murder of Mr. Yule's parents and sister, he began living at the Yule residence with the co-defendant. And that is when police began surveillance because they became suspicious of why these two were basically living together in his deceased family's home. And they began doing surveillance even before the cloned pager search warrant had been obtained. And during that surveillance, they also listened to the co-defendant's telephone calls, obtained telephone numbers from pay phones, and got telephone records from pay phones in totally separate search warrants that were upheld. And based on that information, they were able to determine, at least through circumstantial evidence, that Mr. Radonovich and Mr. Yule were talking to each other. Mr. Yule at the time was in Santa Clara, and the co-defendant was down in Los Angeles. And police from the Fresno Sheriff's Department went to the telephone where the co-defendant was speaking on the telephone, wearing wires, and would actually listen and record some of these conversations. In these conversations, there was discussion about money. There was discussion about a three-shirt deal. There was discussion about airplanes. There was discussions that only Mr. Yule would have known if he was on the other end of that conversation. And so separate and apart from the cloned pager, they were surveilling these two well before the time that they began getting the pages and well after the time that they stopped getting the pages. For example, other evidence that implicated the two of them was that when the Fresno Sheriff's Department went to Mr. Yule, he was at Santa Clara University at the time. I believe it was in 1995, if I'm not mistaken. It may have been in 94. They went to his dorm and told him that his parents and his sister obviously had been murdered and that they believed they knew who the murderer was and specifically stated the co-defendant's name to Mr. Yule. Instead of his reaction being, thank you for finding the murderer or at least having a suspect in the case, he said he did not want to talk to them. He acted very harsh towards them and he actually shut the door and said he did not want to talk to them. Immediately after that, there is evidence that Mr. Yule was talking to Mr. Radovich after that. And even well after knowing that he was a suspect in the case, he continued to actually pay for some things that his co-defendant were doing, such as scuba lessons. Helicopter lessons. Things that if it was a suspect who allegedly killed your mother, your father, and your sister, you would not expect to be doing during that time period. Back to, I'm going on a tangent on the wealth of information and the abundance of information there is to find Mr. Yule guilty, but in the context of habeas, there certainly was not an unreasonable determination of the facts. And under Title III, even if there were violations, which we concede there were violations, there was not a suppression remedy available for Mr. Yule because recording was not possible. But even if this court found that the state court was incorrect in its decision, still under the miscarriage of justice standard, there certainly was not a miscarriage of justice in this specific case. And unless there's any other questions on that issue, I'll move to the second issue, which is the tape that was moved into evidence and was later given to the jury. And I differ in my factual analysis in this respect. I believe the tape and the state court found that the tape, which was Exhibit 33, was moved into evidence in its entirety. This is not a situation where evidence went into the jury room that had not been admitted into evidence. Why is there a dispute then over the tape recorder? I mean, if you have a tape that goes into evidence with the jury, what's the jury supposed to do with the tape if you don't have a tape recorder? And I think that's a very interesting question. And I think that's why the – I'm not – we don't know who gave them the tape recorder, but they may have thought that there was already a tape recorder back there in the jury room. I mean, it certainly seems like the judge could have said the jury's asked for a tape recorder. Unless there's an objection from counsel, I'm going to provide them with one. Or does counsel have any concerns here and the lawyers would have had an opportunity to say, well, Your Honor, we would really only like them to hear the last 10 minutes of the tape and not have sort of free reign with the tape. So the trial judge might have done something different. Well, I agree with you. I think under Federal habeas, whether or not the trial judge broke his promise isn't the issue. I think the issue is whether or not there's any U.S. Supreme Court state – U.S. Supreme Court authorities stating that this would be a violation of some constitutional right. And in this case, it just wasn't a violation of a constitutional right. It may have been a violation of a promise that the Court made, but it wasn't a violation of a constitutional right. The Court had said that it would only play tapes in the courtroom, right, or bring the jury back in. It did. Yes, it did. And there's no dispute that he did say that. It's on the record. There's also, in my opinion, no dispute that the tape was moved into evidence in its entirety. And despite this, the Fifth District Court of Appeal did state that they did not find that there was any statutory or constitutional violations based on the Court's broken promise, because that's essentially what it was, a broken promise. But it did not implement any constitutional rights that would afford Mr. Yule any type of relief under Federal habeas. In addition, the tape contained virtually no audible information. The parties stipulated that it wasn't subject to transcription because it was virtually inaudible. And they stipulated that it did not have to be transcribed due to that. In addition to that, one of the officers, Officer Knight, testified that it was a two-hour tape that was pretty much inaudible, and she described it as excedrin. I think she says it's excedrin headache number 10. She says it's just a really difficult tape to listen to. And more importantly, the Fifth District Court of Appeal stated they listened to the And based on that, there's absolutely no way that it could have been harmful to the jury or injurious to the jury under Brecht. There just certainly is not any evidence that there was something within that tape that would have been prejudicial. And the Fifth District Court of Appeals finding that the tape was inaudible and that it was unintelligible is certainly afforded deference under habeas. Unless the Court has any other questions, I would submit. Thank you. Thank you, counsel. Just three very quick points about the tape, Your Honors. First, as to whether or not the entirety of the tape had been admitted into evidence, I just want to direct the Court again to our briefing. The Court had said only portions of the conversations on May 14th were played before the jury. That was all that was admitted into evidence. The Court expressly told counsel and everybody else in the courtroom that any replays were going to be done of the tape would be done in open court. You can only replay what has already been admitted into evidence in the first instance. The entirety of the tape never was admitted. Secondly, as to prejudice arising from this, I just would direct the Court's attention to what the foreman said to the judge when this all came up after the jury had reached its jury verdict. And the Court goes to the issue of prejudice. The foreperson described that the holdout juror had changed his vote because he wanted to listen to that tape, and it was immediately after listening to that tape that he changed his vote. Finally, as to the hearing, the court of appeals having listened to the tape, that was not an evidentiary hearing. We don't know what that court of appeal did. They didn't have counsel present. We didn't have any way of knowing whether or not they simulated the conditions in the jury room or whether they even knew what they were listening to. So that, under Taylor v. Maddox, that hearing, such as it was, was absolutely deficient and renders their factual finding suspect. Thank you, Your Honors. Thank you. Thank you. Uh, Yule v. Scribner is submitted at this time. Thank you, counsel. Appreciate your arguments.
judges: Vance, Paez, Bybee